My name is Bruno Bemby. I represent the petitioner in this matter, Mr. Li, who is seeking review of a denial of an application for asylum. His wife was sterilized in China after they had three children. Then they moved to live in another part of China for a number of years and he made it to the United States. The immigration judge's main problem with the case was an omission of, he failed to mention that his wife had been sterilized principally at an airport and the airport examiner came to the immigration court hearing and testified. However, when Mr. Li had an opportunity to respond to some of his attorney's questions, he did state that he thought he had mentioned the sterilization. When the airport examiner was testifying in immigration court, I noted in my brief that there's no indication that that testimony was simultaneously translated so that Mr. Li would be aware of everything that the airport examiner was saying. But when he did have an opportunity to respond, he did say that he thought he had mentioned it. GENERAL VERRILLI In any event, the law didn't permit it around this time. ASHCROFT It certainly did not. And there's no indication that the airport examiner would ask him any questions about a basis for asylum which wasn't a basis for asylum back then. There's no indication really how long the interview lasted, although Mr. Westlake indicated that it was that the person could be detained for as long as four hours before they were released. But the examination consisted of 50 questions, and you can't be certain if everything that Mr. Li stated was indicated in that question and answer. There was some dialogue in the transcript about some questions and answers that occurred prior to the interview with the translator. So it didn't seem like that got into the record. There was also some concern about Mr. Li's three written asylum applications, which failed to mention the sterilization. But that was they were prepared in 1993, also when that was not a basis for asylum, which is similar to the Chen case that this Court decided. But I also indicated in my brief that the people who produced that document were unreliable individuals. Mr. Li testified that he did think that at least somebody in that office was an attorney, but there's no indication in the file that that's the case. He could have just been mistaken about that, because the rules require certain indications for documents prepared by attorneys, that the attorneys submitted notice of appearance or certainly at least signed the document. And the INS. So the counsel, even though you are correct that perhaps he would not have mentioned the sterilizations, how about answering no when he was asked whether he or any of his family members had ever been arrested, detained, interrogated, or imprisoned? Why would he answer no to that if he had, in fact, been detained? Well, first of all, we don't really know how well they translated or how reliably they propounded the questions to Mr. Li about that. We don't really know when he says that they read it back to him if they, in fact, read everything from the forms. These were people who were unqualified to prepare these applications. And INS accepts these applications knowing that these people are unqualified to do that. Was there any indication in the record that there were translation difficulties? Well, this is as far as the preparation of the 1993 applications. There's no indication that they're reliable. Is there any indication that there were translation difficulties? On this particular day, in his immigration court hearing, he had a Fukunese translator, but there was indication that the previous interview at the airport was in Mandarin, and that he did not have much education, so probably... Specifically, was there any indication in the record that there were translation difficulties? In the immigration court hearing? I don't believe there are. In the record anywhere? Is there in the record anywhere that there were specifically translation difficulties? No, but I think you can draw an inference that based on his very limited education, he said that he had three years of education, and he's from a part of China where the principal language is Fukunese, and the interview at the airport was apparently conducted in Mandarin. I'd also like to point out that... I wasn't talking about the airport interview. I'm talking about the applications. In the applications, he checked no to the question as whether or not he or his family members had ever been arrested, detained, interrogated, convicted, or in prison. Are you saying that was translated to him, those questions? Well, I'm saying that we don't really know what happened, because the people who prepared those forms didn't comply with the regulations. They didn't indicate that they were authorized to prepare those forms, and unfortunately, the situation in New York is that there are many unqualified people who are doing this. I guess it serves a humanitarian purpose to allow non-attorneys to do this, but it's highly inappropriate then to really hold the alien to the exact letter of all these documents which INS accepts, knowing that they're not filled out in compliance with the regulations. And Mr. Lee mentioned that in his testimony that he was taken away to the local commune. He might not have equated that with an arrest, and at the airport interview, it mentions, were you ever arrested or in prison, and he said no. But I was talking about the applications. Right. What in the record, from Mr. Lee's perspective, caused him to question those answers on the application? Well, it may not have occurred to him, because he might have thought that was in the context of some type of criminal prosecution, as opposed to being placed on a wagon and held overnight by family planning authorities. The difficulty, I gather, from looking at the record is that he had now, subsequently, he apparently had some serious problems that he could have talked about and he didn't. Well, that's right. But he did say in court that he did mention the sterilization, at the interview. And there's no guarantee that everything that he said was placed into that, written down on that document. What's our position legally on airport interviews, though? Well, at least I think where there's indications that the document, the preparation of the document is not reliable, that it shouldn't be given full weight. I think that that's the Third Circuit's cases on this, the Balasub-Bram-Mannering and the Senate-Dirac decisions. Because the manner in which the documents were prepared were unreliable, they shouldn't be given that much weight. And then the entire record on the substantial evidence standard should be reviewed. And it was fairly well established that there's no question that he had the three children and that he has a wife. And under the existing policy in China, there's no question that that policy, in fact, exists. There's a tremendous amount of documentation to show that. So he was in violation of it? Yes, he was. Now, you said there's no doubt in the record that there were three children and a wife? That's right. And where did that come from? Well, the immigration judge simply didn't make a finding to that he did. What evidence in the record are you relying upon? Other than his testimony, the household registry indicates that he has the wife and the three children. And there's also the marriage certificate. Also at the airport, he said, I have three children. So the airport interview is good for that, but not for the other information? No, I would respectfully submit that the airport document is unreliable. But also I'd like to point out that the inbound decision in the Li case in this circuit speaks about forced gynecological examinations as a basis for asylum. And that was decided this past January. And there was no evidence to challenge Mr. Li's statements that his wife had this IUD forcibly inserted. And if I may, I would like to reserve the remainder of my time for rebuttal.  May it please the court, my name is Earl Wilson on behalf of the respondent, Attorney General John Ashcroft. Your Honor, if I can just overall, I think if you look at the record in this case, I don't think the Petitioner's Counsel really disputes it. There are a number of inconsistencies. What were the inconsistencies when the law did not permit sterilization to be an issue in 1992 and 1993? Do you mention things that have no bearing on the law? Your Honor, if you look at the airport interview. No, why should he have mentioned it? Your Honor. Please answer that question. Your Honor, what he did state in that interview. Why should he have answered it? Your Honor. Why should he have mentioned it? Your Honor, I'm not focusing on whether he should have mentioned it. That's my question. Why should he have mentioned it? Your Honor, if he's coming here and he's asking to state his claim. No, no, please answer my question. It's not a basis for asylum. Why should he have mentioned it? It's reasonable to think that he should have under the circumstances, Your Honor. Tell me what the circumstances were when it's not a legal basis. Your Honor, when Mr. Leak comes into the country, he's asked what is his basis for his claim. It's not a legal basis. Why should he mention it? Should he say, my, no. Your Honor, he's telling a story. He's telling a story, but he should stick to the relevant details, shouldn't he? Your Honor, if you look at it. What's the relevance of a non-legal basis? Your Honor, if you look at the airport interview. No, answer me. Don't tell me to look at it. I'm asking you a question. I think it's relevant when you ask someone a question about what is the basis. I mean, you can ask a question about why he shouldn't mention anything. He mentions a statement that irrelevant. The immigration judge found that it's relevant, Your Honor. It's relevant, but the law says it's not relevant. No, but your claim is absurd. It's absolutely absurd. Now, I want to take you through this immigration judge. Just look at the record here on page 40 of the transcript. I think it's age. Of the transcript or the opinion? No, no, the opinion. You've got page 40? Yes. Where she says, after listening carefully, the court finds his credibility was low. You know, what's the first example? He did not tell his current attorney that he's a Catholic when she was filling out page 1 because he didn't think it was necessary to tell her about it. Now, that's all he said. And then if you look at the transcript, I didn't tell them about my religion. The court says, what is your religion? He answers, Catholic. Why didn't you tell the law firm you were Catholic so they could type that into the answer? Lee, well, I didn't feel it was necessary to let them know about my religion. The court, all right. Well, that was a perfectly reasonable answer. What are we supposed to do? Recite the Apostles' Creed or something? I mean, what more could he have said? Will you answer that? Isn't this what I'm asking? Your Honor, I don't know what more he could have said. So why should the judge take that as a reflection of his credibility? Your Honor, the court looks at the fact there's a question that's on the application, and he doesn't answer it. The case didn't turn out. He thought it was irrelevant. Your Honor, if I may at least respond for the record, because I at least have to make the record for the case, and I'm not getting a chance to. No, but you have a chance to answer the judge's question. Right, and I'm answering it. How does that reflect on his credibility? The question is asked. It's a question that's required on the application form. And these are questions that are asked. I mean, if you can't, and therefore he's got to answer the questions that are being asked there. He has to answer the question of the application. What an absurd answer that is. Your Honor, if you look at the record on the issue of the inconsistencies here. What are the inconsistencies? We have one set where she goes into his religion because he didn't make a full act of faith or something. I don't know what that was. Your Honor, if I may. Let's look at the next time that she. Excuse me. Please go ahead on the following page where she gets into speculating that it was a voluntary sterilization. Does she have any basis for that? Yes, Your Honor. Why? Because what you have here is the statement that's made that he's coming over here for money. There's no indication when he comes over that says, I'm coming over here because my wife is sterilized. When he fills out his application. Oh, you're going back. You're going back. No, but you're asking me. Your Honor, if I may, you're asking me the basis for it. If you look at the record as a whole, someone comes in here and says, you know, I'm coming here because I have financial problems. You ask him to fill out his first application. He doesn't mention sterilization. The second one, he doesn't. Third, he doesn't. He makes all these inconsistencies. I think I know what you're doing, but the question you missed was what Judge Newman asked you. He didn't mention sterilization. In your view, that's critical. But at the time he was asked the question, it wasn't critical because sterilization was not a basis. That's what the judge is asking. So why would he have mentioned what wasn't a basis at the time? It would be as if you had said no communists could come into the country. Now, just assume that's what we had said. No Muslims could come into the country. If that was not a restriction at the time he came, then he wouldn't be expected to mention it. Now, if it was a restriction at the time he came, then he would be expected to mention it. But his failure to mention it can't be held against him because it wasn't a restriction at the time. Do you follow the logic of what Judge Newman said? I understand what you're saying, Your Honor. What I'm trying to point out is if you look at the airport statement, what you have is in addition to the failure to mention. But why should he mention it? You can set that aside. There's also a question that says, any other reason to fear returning to China? You know what, I don't know whether you've been to China, but that's one of the difficulties. An American would approach something in one way. A person leaving China might approach it in a different way. He might think it's perfectly proper to say you can only have one child. And if you have more than one, we'll do something about it. So he could see that there's nothing unusual until he ultimately learns that is unusual. Do you follow that logic? Your Honor, that's one way to read the record. Yeah, but don't we have to read it? How do we have to read it? You have to read it. The immigration judge hears that argument and made a reasonable conclusion that based on the fact that he said no fear, he comes over here. I'm not trying to keep you from making the record, but let me help you point to what the problem is. This immigration judge even speculated that he may have voluntarily sterilized himself. Well, there's nothing in this record to justify that kind of speculation. Is there? Your Honor, it's really a conclusion. It's an inference that the judge draws from seeing no evidence of forced sterilization. Granted, you can – What do you mean no evidence? Mr. Carson, will you please respond? He testifies to it. That's evidence. So there was evidence of a forced sterilization. Now, let me direct your attention again to page 42. Do you have it? Yes, Your Honor. Will you look at the final paragraph? Yes. He was not fined. And this judge is very disturbed because China did not enforce all its policy. And if you look at her opinion in the companion case, the Wang case, she assumes that China is very inconsistent. Are you representing the government in Wang, too? Yes, Your Honor. Well, if you read that, you'll see that there the judge says, well, China is very inconsistent. So we can't expect it. Here she says they must have been consistent. She just went out of her way to take different positions in order to throw out the immigrant. Your Honor, I respectfully disagree with that. I think if you look at the record and you look at the inconsistencies here, one is you've got a statement concerning the alleged fine. It's inconsistent. It's all over the place. It's 7,000. It's 8,000. It's 8,200. It's paid. It's not paid. If you look at that, this is the evidence concerning where he testifies as to how much he was fined after his first and second child. At one point he said it's $3,503,000. Then he says it's 8,200. Then he says I paid the entire fine, which goes to whether he even has a fear of going back. But the other point is, Your Honor, there are other evidence in this case here. There's a specific question. Were you ever, do you fear any other harm? He says no. He then files three applications. He doesn't mention it. Excuse me. Does the judge have a reason? Mr. Wilson, where does this discrepancy on the money come up in her opinion? That's in page 42. Well, where is the discrepancy that she makes or raises? Haven't you got the cases confused? Haven't you read Wang into Lee? I don't believe so, Your Honor. Well, find it, support what you just said. Although that's entirely possible, as I imagine. It is possible. You misstated the record. Well, as I said, I'm … You should apologize. Counsel, I think you're talking about page 41 of the record, where she says the fine amount noted in the early asylum applications is greatly inconsistent. That's it, Your Honor. Where is it? It says, the halfway down, it says more. The fine amount noted, this is the end of the first full paragraph of the asylum application. She didn't use the numbers that you had. Well, she said it's inconsistent. And if you look at the record, Your Honor, it's because he testified, and we cite this in our brief. Our brief says, he cites, and we recite the facts. First he says $3,500, $33,000 had been $3,500. Then he says $8,200. Then he says, I would quote, he said, I paid the $8,000 fine. The record in this case here supports that finding. He testifies back and forth on this issue. You know, Mr. Wilson, we have to review the case. And when we look, we have to see indications of bias on the part of the person who was making the record. And we do see some indications of bias on the part. Now, as to the numbers, and I don't know the facts, but I know that if you ask a person from Europe today, how many dollars did X cost, if he gave you an answer for a year ago, he would give you a different answer than he would give you for today, because the euro fluctuates. I assume it's true with every foreign currency, when you must translate it from the foreign currency to dollars. So that may be an inconsistency, as you argue, but it also may not be. Your Honor, on the issue of bias, there's no allegation in this case of bias. But let me say a more important point. Following up on what you just said about the payment of the fine, there is this testimony in this record that says, I paid the fine of $8,000. Yes. Was it in dollars? $8,000 RMG, or whatever the. Oh, it's a very different amount. It's American dollars. I misspoke, Your Honor, and I apologize. Then my point doesn't get away. Yes, yes, yes. That is a clear statement. He was talking strictly with euros and then euros. Right. But when you say you paid it, also, when you affirmatively said there was no. I misunderstood. Okay, counsel, you need to wrap up, because you're over your time. So if you would wrap up. In summary, Your Honor, the question here is whether the immigration judge's decision lacks any rational basis. There is evidence in this record, while this Court may disagree, there is evidence in this record to support the immigration judge's finding, and it should be affirmed. Thank you, counsel. Rebuttal. I believe, Your Honor, that if the Court were to give a diminished weight to the prior asylum applications and the airport statement and look at the entire record, then. Why should we give diminished weight to the prior asylum applications, based on your premise that the preparers were not qualified? That's right. As a matter of law and regulation, they weren't permitted to be doing what they did. But that doesn't mean that we totally discount them. What case authority do you have that says we should discount the contents of applications where the preparers are not authorized by regulation to prepare them? Well, the regulations in HCFR, which I referred to, but fundamental fairness. Once they're in the record. Once they're in the record and they've been acted upon, what authority do you have that says we should discount the information contained therein? Fundamental fairness. Look at the way in which they were placed into the record. It was a fait accompli when my client's attorney walked into immigration court. The immigration judge said, oh, by the way, there are these asylum applications. If we take your argument to its logical conclusion, then there would be no application for asylum, and your client would not be entitled to any relief at all. Do you want us to do that, to just totally disregard the application so that there is no application at all in the record? No. There was a later asylum application submitted with the attorneys who prepared the motion to reopen. But I don't think it's appropriate for the government, the INS, in other words, to be accepting applications for people who are filling them out in violation of their own regulations and then using those documents to try to impeach the clients when the INS shouldn't be receiving those or at least should be looking at them with a grain of salt and understanding that there's no indications of reliability in the manner in which those forms were filled out. What's your response to the IJ's finding that the X-ray that was submitted in support of the tubal ligation testimony was somewhat suspect? What's your response to that? I don't think I remember that exact passage except that the X-rays were taken 14 years after the alleged operation of the sterilization, I should say. Well, back in 1983 or whenever the sterilization occurred, there was no motivation or reason for Mr. Lee or his wife to go out and try to document that. Were the X-rays identified as belonging to his wife? I don't think that it's conclusively established that it is. It's just his testimony, his representation that it is, and the U.S. doctor who looked at it just said that much, that I looked at an X-ray which indicates that an individual was sterilized. But we have Mr. Lee's testimony to put the link together, and I think under the board's decision in the matter of YTL, they indicated, at least the way I read that case, is that basically it doesn't matter how long you wait before you leave China after there's a sterilization. The sterilization is something which is an ongoing type of persecution. But just the sterilization itself doesn't compel the grant of asylum. It's if you're in opposition to the policies that asylum is indicated. So if someone does oppose the sterilization policy, there is no basis for asylum. Would you agree with that? Well, I would slightly disagree with that, Your Honor. Why? If a person didn't oppose the policy but for themselves on an individual basis opposed being sterilized, it's not a position as to the overall policy. There's an automatic conclusion that it's a political opinion, whereas previously it wasn't. It has to be a forced sterilization. Right. And forced, and I think the statute may also use the word involuntary, but I don't think that forced necessarily means with guns pointed at you. You just made the statement that you can leave any time after the sterilization, and I wanted to qualify that by saying it has to be an involuntary or forced sterilization in order to trigger the asylum. Right. But if you look at the legislative history, which appears in 1995, the congressional hearings of some of the experts they had, I think, indicated that in other countries  and those are far less coercive than what exists in China. I agree. I don't know. The final thing I wanted to ask you is do you take issue with the immigration judges finding that even though appellant, the applicant testified that he dared not return home after the events in 1984, he remained in China in a neighboring province for seven years and testified that his wife returned to applicant's mother's home on many occasions and there was no indication she was ever arrested for nonpayment of fines. Do you take issue with that finding by the immigration judge? Well, if you look, I think, at the entire record, Mr. Lee indicated he moved to another province. Just that specific finding. Do you take issue with that finding? Yes. Yes, I do, Your Honor, because Mr. Lee indicated that in Guangdong province when he was living in Guangzhou that he was concerned that if the authorities from Fujian province had learned that he was there in Guangzhou, that they might communicate with the authorities in Guangzhou and then he would be in trouble. And he didn't – I may be confusing my cases, but I don't think that – I think he indicated that he didn't have the proper documentation to be there. But he remained there for – do you take issue with the finding that he remained in a neighboring province for seven years? But that's part of the underground population, so that wouldn't really be exactly a lawful presence in the Guangzhou province. He would have something to fear from the government just by doing that. All right. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is Wang v. Ashcroft.
judges: Farris, Noonan, Rawlinson